UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

CRYSTAL J. SHIPLEY,          )       CASE NO. 3:15CV708
)
        Plaintiff,             )       MAGISTRATE JUDGE
)       GEORGE J. LIMBERT
               v.             )
)
CAROLYN W. COLVIN[1],       )       MEMORANDUM OPINION & ORDER
ACTING COMMISSIONER OF    )
SOCIAL SECURITY,         )
)
        Defendant.           )

Plaintiff Crystal J. Shipley ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security ("Defendant") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #1. Plaintiff asserts that the administrative law judge ("ALJ") erred in his decision because he failed to properly evaluate the opinion evidence, failed to properly determine her residual functional capacity ("RFC"), and erred in his evaluation of the reviewing physician's opinions. ECF Dkt. #15.

For the following reasons, the Court REVERSES the ALJ's decision and REMANDS the instant case to the ALJ for reevaluation and more thorough explanation concerning the ALJ's treatment of the opinions of Dr. Barnes.

## I.      FACTUAL AND PROCEDURAL HISTORY

On April 15, 2011, Plaintiff filed applications for DIB and SSI alleging disability beginning March 1, 2011 due to a head injury, back injury, knee problems, depression, bipolar disorder, chronic pulmonary obstructive disease ("COPD") irritable bowel syndrome ("IBS") and gastritis. ECF Dkt. #11 ("Tr.") at 209-218, 244.[2]  The Social Security Administration denied Plaintiff's

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2]All citations to the Transcript refer to the page numbers assigned when the Transcript was filed in the CM/ECF system rather than the page numbers assigned when the Transcript was compiled. This allows the Court to easily reference the Transcript as the page numbers of the .PDF file containing the Transcript

applications initially and upon reconsideration. *Id.* at 86-169. Plaintiff requested a hearing before an ALJ. *Id.* at 171-126. On June 18, 2013, the ALJ held the requested hearing and took testimony from Plaintiff, who was represented by counsel, and a vocational expert ("VE"). *Id.* at 46.

On July 24, 2013, the ALJ denied Plaintiff's applications for DIB and SSI. Tr. at 19-39. The ALJ found that Plaintiff had not engaged in substantial gainful activity since March 1, 2011 and Plaintiff suffered from the following severe impairments: minor degenerative disc disease ("DDD") with post-operative changes to interval right cruciate ligament surgery; mild traumatic brain injury ("TBI"); bipolar disorder; cognitive disorder; panic disorder; and personality disorder. *Id.* at 21. The ALJ opined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 22. The ALJ thereafter determined that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 406.1567(b) and 416.967(b), except that she could: occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; frequently balance, never climb ladders, ropes, or scaffolds; avoid all hazards such as unprotected heights, hazardous machinery, and commercial driving. *Id.* at 25-26. The ALJ further found that Plaintiff was limited to simple, routine, repetitive tasks; no tasks involving concentration and detailed, precision, or multiple simultaneous tasks; in a work environment free of fast paced production requirements or having any up or down line dependent co-workers; involving only simple work-related decisions; with few, if any, workplace changes; and should only have occasional superficial interactions with others on trivial matters, defined as the dispensing and sharing of factual information, not likely to generate an adversarial setting. *Id.*

The ALJ further found that Plaintiff was unable to perform any past relevant work, but she could perform other jobs existing in significant numbers in the national economy based upon the RFC that he determined and the testimony of the vocational expert. Tr. at 37-38. Based upon the VE's testimony, the ALJ found that Plaintiff could perform the representative occupations of bench assembler, inspector, and sorter/packer. *Id.* Consequently, the ALJ determined that Plaintiff had

---

correspond to the page numbers assigned when the Transcript was filed in the CM/ECF system.

not been under a disability, as defined in the Social Security Act, from March 1, 2011 through the date of his decision. *Id.* at 38.

On April 10, 2015, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1. Plaintiff filed a brief on the merits on August 12, 2015. ECF Dkt. #15. Defendant filed a merits brief on November 3, 2015. ECF Dkt. #18. Plaintiff filed a reply brief on November 17, 2015. ECF Dkt. #19.

## II.  STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see  20 C.F.R.  § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## III.  STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope

by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted)). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## IV.    RELEVANT MEDICAL EVIDENCE

Plaintiff asserts that the ALJ erred in his evaluation of the opinions of the non-treating physicians. ECF Dkt. #15 at 20. Plaintiff acknowledges that while the record contains opinions and statements made by her treating neurologist, Dr. Bauer[3], the ALJ properly afforded less than

---

[3] Dr. Bauer began treating Plaintiff on May 1, 2011 and on September 16, 2012, wrote a letter at the request of Plaintiff's counsel concerning Plaintiff's treatment and Dr. Bauer's findings and opinions. Tr. at 653. In the September 16, 2012 letter, Dr. Bauer reviewed his clinical findings from his visits with Plaintiff and the radiological findings. Id. at 653-657. He opined that Plaintiff sustained an extension/flexion injury, a TBI, low back pain into both legs, knee injuries and cognitive changes as documented in Dr. Wynkoop's neuropsychological testing, infra. Dr. Bauer opined that Plaintiff's injuries were directly related to the automobile accident and he opined that the injuries were permanent in nature. Id. at 657. He indicated that while Plaintiff could return completely to normal, it was not likely based upon the time of healing and

controlling weight to them because Dr. Bauer treated Plaintiff mainly for her physical problems, his opinions were conclusory, and the opinions were related to issues reserved for determination by the ALJ. *Id*. at 12, fn. 6.

However, Plaintiff contends that the ALJ erred in evaluating the opinion evidence of non-treating physicians because he ignored significant findings on neurocognitive testing and failed to evaluate the evidence pursuant to the Social Security Regulations and Rules. *Id*. at 12. She complains that the ALJ summarily dismissed the opinions of examining physicians Drs. Morse, Wynkoop, and Barnes, and he improperly gave more weight to the opinions of non-examining, reviewing physicians, such as Dr. Rabold. *Id*. at 13-20.

On March 1, 2011, Plaintiff was life-flighted to the Toledo Hospital Emergency Room after the car that she was driving was rear-ended by a semi-truck at a high rate of speed. Tr. at 378. She had to be extricated from the vehicle. *Id*. She was evaluated and underwent CT scans and x-rays. *Id*. at 379-385. A CT scan of the head showed a scalp hematoma and an arachnoid cyst. *Id*. at 394. She was discharged a day later with 15-17 staples in her head due to the scalp laceration and advised to follow up with her doctor. *Id*. at 381.

On May 4, 2011, Plaintiff presented to Dr. Bauer, a neurologist, for headaches, memory loss and chronic low back pain with radiculopathy. Tr. at 506. Upon examination, he assessed headaches of a post-traumatic origin, low back pain with radiculopathy, cognitive communication deficit, brachial plexus lesions, and concussion with loss of consciousness of an unspecified duration. *Id*.at 507-508. Dr. Bauer continued treating Plaintiff, prescribing medications, referring her to physical therapy, and administering trigger point injections. *Id*. at 507-524, 561-577, 626-633.

Dr. Morse, a clinical psychologist, performed a psychological evaluation of Plaintiff on June 20, 2011 for the agency. Tr. at 481. He indicated that his evaluation was based upon a 50-minute clinical interview that he conducted with Plaintiff, collateral information provided to him by the agency, a mental health assessment from Firelands Counseling and Recovery Services dated March

---

recovery. *Id*. He opined that Plaintiff would require ongoing physical and occupational therapy, as well as aquatic therapy and vocational retraining. *Id.*

-5-

16, 2010, a medical record note from Plaintiff's psychiatrist Dr. Jama, and his own mental status examination of Plaintiff.  *Id.*  Dr. Morse related that Plaintiff had been seeing Dr. Jama for the past year, as well as a counselor for a bipolar I diagnosis.  *Id.* at 483-484.

During the interview and evaluation, Dr. Morse noted that Plaintiff's speech was hyperverbal, tangential and circumstantial.  Tr. at 485.  He noticed her word-finding difficulties, her laughter at inappropriate times, and her difficulty expressing her thoughts in an organized manner and she was a poor historian.  *Id.* at 485-486.  He found her overall mood to be depressed and anxious with a broad and inappropriate affect.  *Id.* at 486.  Dr. Morse found that Plaintiff's overall mental status was good as she was alert and oriented, successfully completed serial sevens test, and she did well on a memory recall task.  *Id.*  He estimated her cognitive functioning to be in the average range.  *Id.*  He also found that Plaintiff's insight and judgment were good as she understood that she had significant mental health problems and she knew that she had some difficulty with irritability but could control her impulses.  *Id.*

Dr. Morse diagnosed Plaintiff with moderately severe bipolar I disorder, most recent episode manic, post-traumatic stress disorder ("PTSD") and adjustment disorder with anxiety.  Tr. at 487.  He rated her global range of functioning at 58, indicative of moderate symptoms.  *Id.*  Dr. Morse concluded that Plaintiff's self-reported mental health symptoms were inconsistent with his behavioral observations of her.  *Id.*  He indicated that "[a]lthough she exhibits some word-finding difficulties, she performed very well on the mental status examination in all areas.  There was no evidence to suggest that her mental health issues significantly interfere with her functioning."  *Id.*  He opined that Plaintiff would have no difficulty remembering work-like procedures or understanding and remembering very short and simple or detailed instructions, despite her reports of memory difficulties.  *Id.* at 488.  He further opined that there was evidence to suggest that Plaintiff would have difficulty carrying out short and simple instructions, or detailed instructions, or in sustaining an ordinary routine, performing at a consistent pace, working with coordination with others, making simple work-related decisions, and completing a normal workday without any interruptions from her mental health symptoms.  *Id.*  Dr. Morse further opined that Plaintiff would have no difficulty in responding appropriately to changes in the work setting, set realistic goals or

-6-

make plans independently of others. *Id*. at 489. He found that there was some evidence that Plaintiff had difficulty handling adaptive activities like household chores and managing her finances, but there was no evidence that she had difficulty in responding appropriately to supervision and co-workers in a work setting. *Id*.

Dr. Morse concluded that some evidence existed that suggested that Plaintiff's mental health symptoms interfered with her functioning. Tr. at 489. He noted that Plaintiff experienced some difficulty in maintaining concentration and communicating clearly with others. *Id*. He indicated that Plaintiff's symptoms were alleviated in the past with medication and counseling. *Id.* He noted that Plaintiff's work history suggested that when Plaintiff was under stress, she avoided work altogether. *Id.* He found evidence to suggest that Plaintiff would have some minor difficulty in handling normal, everyday work pressures. *Id*.

On October 20, 2011, Dr. Wynkoop, a neuropsychologist, issued a report on a neuro-psychological evaluation that he conducted on Plaintiff on September 14, 2011. Tr. at 547. Plaintiff reported lack of concentration, memory loss, confusion, speech impairments, head and back pain, dizziness and fatigue to Dr. Wynkoop resulting from her automobile accident. *Id*. He indicated that he conducted an interview with Plaintiff, Plaintiff's mother, he reviewed numerous medical reports, including the hospital records, neuroimaging report, and primary care and neurologist notes, and he administered a number of psychological, neuropsychological and intelligence tests, including the Galvenston Orientation and Amnesia Test ("GOAT"), the WAIS-IV, a reading subtest from the Wide-Range Achievement Test-3 ("WAIS-3), the Trail Making Test, Multilingual Aphasia Examination ("MAE") Sentence Repetition Test, phonemic fluency, categorical fluency, Halstead Category Test ("HCT"), Personality Assessment Inventory ("PAI"), Rapid Disability Rating Scale-2 ("RDRS-2") and Test of Memory Malingering ("TOMM"). *Id*. at 547-548.

Dr. Wynkoop found that Plaintiff was friendly and cooperative, and she had fluent and coherent speech, despite some difficulty formulating and finding words. Tr. at 552. He noted that Plaintiff appeared motivated to do well on testing and put forth adequate effort. *Id*. Testing showed that Plaintiff was oriented to person, place and time, and her full scale IQ was 97, the average range. *Id.* at 553. As to her ability to pay attention, testing showed that Plaintiff had difficulty with

-7-

sustained attention.  *Id.*  Plaintiff's ability to process information was average to slow average and her learning and recall testing showed average to high average verbal working memory, average to high average retention, the learning of short stories on a high average to superior level, and the recalling of the stories at a high average level.  *Id.* at 554.  Plaintiff's language testing showed clinically problematic confrontation naming and mild word finding and mixing up of words, but average verbal comprehension skills, with the ability to follow simple commands, repeat words, pronounce phoentically complex words, and to explain herself, and to read and write and spell functionally.  *Id.* at 554-555.  Plaintiff scored average to low average on problematic concept formation and organization, she juxtaposed propositions to correctly comply with complex commands, she had slower phoenemic and categorical fluency and alphanumeric processing than expected compared to the WAIS-4 testing results.  *Id.* at 555.  Dr. Wynkoop noted that Plaintiff had substantial difficulty on a test that many experts believed was sensitive to general cerebral integrity and functioning.  *Id.*

As to Plaintiff's mood and personality test results, they showed depression and mood swings, with overemphasis and focus on physical and cognitive functioning and symptoms.  Tr. at 555.  Testing showed a pattern of neurologic symptom over-endorsement which was not an uncommon emotional reaction to a brain injury.  *Id.* at 556.

Dr. Wynkoop opined that:

> Many TBI (traumatic brain injury) experts expect neurocognitive effects of mild TBI to clearly fairly rapidly, typically within the first three months if not within the first month.  However, in Ms. Shipley's case, there is evidence of continued neurocognitive difficulties in the context of symptom validity data suggesting compliance with testing.  Consequently, the test data support the unfortunate conclusion that Ms. Shipley is one of a small percentage of patients with continued neurocognitive symptoms beyond the expected recovery time frame. To the positive, however, it has been only seven months since her accident injuries, and so we should expect continued improvements in cognitive over time.

Tr. at 557.  He diagnosed Plaintiff with:  cognitive disorder not otherwise specified; personality change due to the mild TBI and accident; somatization disorder not otherwise specified; depression not otherwise specified, both consequent to the TBI; anxiety not otherwise specified by history and well-managed; and a premorbid history of bipolar disorder that was well-controlled.  *Id.* at 558. Dr. Wynkoop opined that Plaintiff suffered and continued to suffer neurocognitive difficulties due to

-8-

the mild TBI sustained from the accident. *Id*. He further opined that Plaintiff suffered depression related to "her accident injuries and their consequent neurocognitive limitations, pain and change in lifestyle (e.g., has not been medically released to return to driving or to work)." *Id*. Dr. Wynkoop also opined that Plaintiff suffered from a psychological reaction to the accident "that causes her to believe that she is more limited neurocognitively than she is in reality." *Id*. He further indicated his concern with her returning to driving an automobile due to problems with concentration and ability to follow complex commands. *Id*. at 559. He further noted that "[t]he decision as to whether Ms. Shipley can return to work needs to rest solely with her physicians. However, I am not optimistic about her odds of successfully returning to work in the near term from a neurocognitive, behavioral, and/or emotional perspective." *Id*. He added that if Plaintiff decided to seek academic or vocational retraining, accommodations should exist for her, including "preferential classroom seating, access to teacher's and/or other student's notes (in lieu of a scribe), individually proctored exams, extra time for exams by a factor of two, reader and use of a calculator for exams (to help with attentional problems), extra time for assignments, tutoring as needed, and other accommodations as may become evident with time." *Id*. He also made treatment recommendations. *Id.* at 558.

On November 22, 2011, Dr. Rabold, Ph.D., reviewed the evidence and completed a psychiatric review technique form and a mental RFC assessment form for the agency. Tr. at 121. She reviewed Plaintiff's impairments under Listings 12.02 for Organic Mental Disorders, 12.04 for Affective Disorders, 12.06 for Anxiety Disorders, 12.07 for Somatoform Disorders, and 12.08 for Personality Disorders. *Id*. She reviewed Dr. Wynkoop's opinions and found that his recommendations concerning accommodations for retraining did not correlate with the evidence from his examination which showed that Plaintiff was over-endorsing and other sources showing examinations with a mild TBI and well-controlled bipolar disorder. *Id.* at 122. She opined that Plaintiff was not significantly limited in: remembering locations and work-like procedures; understanding, remembering, and executing very short and simple instructions; performing simple, concrete, 1-2 step instructions with repetition and a slow pace; sustaining an ordinary routine; making simple work-related decisions; asking simple questions or requesting assistance; and being aware of normal hazards and taking appropriate precautions. *Id*. at 123-125. Dr. Rabold further

opined that Plaintiff was moderately limited in: understanding, remembering, and executing detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual; working with others without being distracted by them; completing a normal workday or workweek without interruptions from psychologically based symptoms; interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; responding appropriately to changes in the work setting; traveling in unfamiliar places or using public transportation; and in setting realistic goals and making plans independently of others. *Id.* Dr. Rabold opined that Plaintiff could perform simple, concrete, 1-2 step instructions with repetition and a slow learning pace, in isolation with minimal distractors/stimulation, maybe a flexible schedule, with frequent interactions on a superficial basis with the public, supervisors and co-workers, and working best alone or in a small familiar group. *Id.*

On November 5, 2012, Dr. Barnes, Ph.D, a psychologist and clinical nurse specialist in adult psychiatric mental health nursing and prescription privileges, performed a 7.25 hour independent medical evaluation of Plaintiff for disability purposes. Tr. at 660. In her neuropsychological evaluation, Dr. Barnes found that Plaintiff was oriented to time, place and person. *Id.* at 663. She observed that Plaintiff was slow to respond and comprehend information as she had to stop and think and take a minute or two before answering questions. *Id.* Dr. Barnes found Plaintiff's attention span to be short, she had difficulty focusing, listening, concentrating and staying on task and Dr. Barnes often had to redirect her to the task at hand. *Id.* On short term memory, she could recall six digits forward and five backwards and for long term memory, she could recall 2 of 3 objects on a simple registration task. *Id.* Dr. Barnes found Plaintiff's reality contact to be appropriate, she had no rambling or pressured speech, and the test that Dr. Barnes administered found that she had no malingering behavior. *Id.* at 664. Intelligence testing showed that she had standard or average intelligence. *Id.* Dr. Barnes found Plaintiff's insight to be good, her judgment to be fair, and her impulse control was poor. *Id.*

-10-

Dr. Barnes further observed that Plaintiff had problems with speech and articulation in that she knew what words she wanted to use, but had difficulty expressing them.  Tr. at 664.  She noted that Plaintiff had slow and slurred speech and ran her words together.  *Id.*  She indicated that over time, Plaintiff would become tired and her speech turned to mumbling and running words together.  *Id.*  Dr. Barnes found Plaintiff's mood to be anxious, depressed and overwhelmed, but she was able to control her emotions and was cooperative and calm.  *Id.*  Although she found that Plaintiff had trouble concentrating and paying attention, Dr. Barnes found no evidence of a formal thought disorder, she had a stable mood, and she was able to follow a multiple three-step command.  *Id.*

Dr. Barnes presented Plaintiff's various scores on numerous psychological tests, including her low average scores in short term retention of information, and three standard deviations below the mean for delayed memory which was significantly low relative to her intellectual functioning.  Tr. at 668.  Testing also showed the presence of short term memory deficits affecting her immediate and delayed memories and more so her visual memory over auditory memory.  *Id.*  It was indicative of a severe memory impairment.  *Id.* at 672.  Other testing showed that Plaintiff was having difficulty coping with cognitive stress and processing complex input, and confirmed her self-reports of problems with attention, staying on task and focusing.  *Id.* at 669.  The test measuring attention, concentration and distraction showed results one standard deviation below the mean.  *Id.* at 672.  Another test showed neurological impairment possibly prefrontal lobe disorder.  *Id.*

Based upon her testing and observations, Dr. Barnes diagnosed Plaintiff with: cognitive disorder, not otherwise specified; bipolar disorder, not otherwise specified; panic disorder, without agoraphobia; personality disorder, not otherwise specified;  avoidant and depressive personality traits; phonological disorder due to neurological trauma; TBI; and other physical impairments.  Tr. at 673.  She assessed a global assessment of functioning score of 50, indicative of serious symptoms.  *Id.*  She opined that Plaintiff could exercise appropriate behaviors and was not impulsive, and while Plaintiff was friendly, open and cooperative, she was anxious, depressed and could become easily irritable and/or confused.  *Id.* at 674.  Dr. Barnes further opined that, "[u]nder conditions of stress, Crystal would have difficulty functioning due to her tendency to be forgetful and distracted."  *Id.*

-11-

## V.     RELEVANT PORTIONS OF ALJ'S OPINION

In his decision, the ALJ noted that Plaintiff's counsel argued at the hearing that great weight should be afforded to the opinions of Drs. Barnes and Wynkoop.  Tr. at 28.  The ALJ indicated that Drs. Barnes, Wynkoop and Morse "all observed findings consistent with her brain injury, but added that she performed relatively well on her mental status examination and testing."  *Id*.  As support, the ALJ cited to Dr. Wynkoop's diagnosis of a mild TBI, the intelligence testing which showed that Plaintiff had average intellectual functioning, and Dr. Wynkoop's observation that Plaintiff could follow simple commands, repeat words and phrases, pronounced phonetically complex words, and read, wrote and spelled in a functional manner.  *Id*.  The ALJ further cited to Dr. Morse's findings that Plaintiff had occasional word-finding difficulties, but did "very well" on her mental status examination and she had no difficulty understanding and responding to his questions and there was no evidence of learning difficulties.  *Id*. at 29.  The ALJ also cited to Dr. Morse's conclusion that no evidence suggested that Plaintiff would have difficulty remembering work-like procedures or difficulty understanding and remembering very short and simple or detailed instructions.  *Id*.

The ALJ then transitioned into discussing Dr. Barnes' opinion, finding most of it consistent with Dr. Morse's opinion.  Tr. at 29.  He noted that despite a third-party's report that a phone rang numerous times and a vacuum cleaner was going on and off during Dr. Barnes' evaluation with Plaintiff, Dr. Barnes concluded that Plaintiff performed well on the examinations she administered, intelligence testing placed her in the average range of intellectual functioning, she completed serial seven subtractions, could recall six digits forward and five backward, and she had normal abstract reasoning abilities.  *Id.* at 29-30.  The ALJ also found that while Dr. Barnes indicated that Plaintiff had problems articulating and enunciating words as she slurred her speech with words running together, she also noted that Plaintiff answered questions succinctly and accurately, and she could follow multiple three-step commands.  *Id.*

As to Dr. Barnes' conclusions that testing showed that Plaintiff had a severe memory impairment and Plaintiff's level of cognitive functioning was compromised due to problems with attention, focusing, and short-term memory problems, the ALJ declined to give significant weight

to this part of her opinion.  Tr. at 30.  The ALJ reasoned that Plaintiff nevertheless did well on Dr. Barnes' examinations despite the third-party report that indicated the phone and vacuum cleaner distractions.  *Id*.  He also explained that the scores showing a severe memory impairment were assessed a year after Dr. Wynkoop's examination which showed relatively the same ranges, which he believed suggested that Plaintiff's condition did not deteriorate as significantly as Plaintiff alleged.  *Id*.

The ALJ also found that Plaintiff's demeanor and manner presented at the hearing contradicted her mental limitations as she answered questions logically and stayed on point and remembered specific details, which showed a greater ability to maintain focus and remember details than that which Plaintiff had alleged.  Tr. at 32.  The ALJ acknowledged that while Plaintiff's presentation at the hearing was not a conclusive indicator of her overall cognitive abilities, he did give this some weight in his credibility determination.  *Id*.  The ALJ also indicated that he afforded little weight to the fact that Plaintiff was receiving third-party disability benefits because it was unclear whether the private insurance group used the same definitions of disability or whether it was determined that Plaintiff could not return to all work rather than just her past work.  *Id*. at 32-33.

Finally, the ALJ explained that Plaintiff was involved in litigation concerning the automobile accident she was in and litigation with her disability insurance provider and therefore she had a legal and financial interest when she attended her evaluations with Drs. Wynkoop and Morse.  Tr. at 33. He noted that Plaintiff received a lump-sum disability insurance settlement and a lump-sum settlement from the automobile accident with on-going monthly benefits.  *Id*.

In summary, the ALJ concluded that the totality of the evidence did not support the opinions of Drs. Barnes, Wynkoop and Morse that Plaintiff could not perform all competitive employment as the opinions were inconsistent with the mental status examinations and objective testing.  Tr. at 34.  He noted that while the medical sources observed findings consistent with her brain injury, they each indicated that Plaintiff performed relatively well on mental status examinations and testing, and he adequately accommodated her limitations in his RFC.  *Id.* at 28.

As to the opinions of the agency reviewing physicians, the ALJ acknowledged that they were not entitled to as much weight as the opinions of examining or treating physicians.  Tr. at 36.

However, the ALJ found that those opinions were entitled to some weight, "particularly in a case like this in which there exist a number of other reasons to reach similar conclusions (as explained throughout this decision)."  *Id.*

## VI.    LAW AND ANALYSIS

### A.    TREATMENT OF THE OPINIONS OF EXAMINING PHYSICIANS

Opinions from agency medical sources are considered opinion evidence. 20 C.F.R. § 416.927(f). The regulations require that "[u]nless the treating physician's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do work for us." 20 C.F.R. § 416.927(f)(2)(ii).  More weight is generally attributed to examining medical source opinions than on non-examining medical source opinions. *See* 20 C.F.R. § 416.927(d)(1). However, an ALJ can attribute significant weight to the opinions of a non-examining state agency medical expert in some circumstances because nonexamining sources are viewed "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." SSR 96–6p, 1996 WL 374180. However, the Sixth Circuit has held that the social security regulation requiring an ALJ to provide good reasons for the weight given a treating physician's opinion does not apply to an ALJ's failure to explain his favoring of one examining physician's opinion over another. *See Kornecky v. Comm'r of Soc. Sec*., 167 Fed.Appx. 496, 508 (6th Cir. 2006).

Moreover, while an ALJ is not required to discuss each and every piece of evidence in the record to justify his determination, *see, e.g., Thacker v. Comm'r of Soc. Sec.*, 99 Fed.Appx. 661, 665 (6th Cir. 2004), when the opinion of a medical source contradicts the ALJ's limitations in the claimant's RFC, the ALJ "'must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis.'" *Wolfe v. Colvin*, No. 4:15CV1819, 2016 WL 2736179, quoting *Fleischer v. Astrue*, 774 F.Supp.2d 875, 881 (N.D. Ohio 2011).  Social Security Ruling

-14-

96-8p provides, "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, *7 (July 2, 1996).

Plaintiff first asserts that the ALJ summarily dismissed the evaluations of Drs. Morse, Wynkoop and Barnes.  ECF Dkt. #15 at 12-13.  However, a review of the ALJ's decision does not support Plaintiff's assertion concerning his evaluation of the opinions of Drs. Morse and Wynkoop. As set forth above, the ALJ's decision addresses each of the opinions of these medical sources in great detail.  Tr. at 28-30.  However, the Court finds that the ALJ erred in his evaluation and analysis of Dr. Barnes' opinion.

### 1.   DR. MORSE'S OPINION

As to Dr. Morse's opinion, the ALJ properly addressed this opinion and substantial evidence supports his findings concerning this opinion.  The ALJ noted that Dr. Morse found that while Plaintiff had occasional word-finding difficulties, she did "very well" on her mental status examination "in all areas" and performed "very well on the memory recall task of the mental status examination."  Tr. at 29, citing Tr. at 487-488.  Dr. Morse opined that "[t]here was no evidence to suggest that her mental health issues significantly interfere with her functioning."  *Id.* at 487.  The ALJ noted that part of Dr. Morse's opinion in which he stated that no evidence suggested that Plaintiff would have "any difficulty remembering work-like procedures or have difficulty understanding and remembering very short and simple instructions, as well as detailed instructions." Tr. at 29, citing Tr. at 488.  Dr. Morse further opined that Plaintiff would have no difficulty sustaining an ordinary routine, performing at a consistent pace, working with others, making simple work-related decisions, and completing a normal workday without any interruptions from her mental health symptoms.  *Id.* at 488.  Dr. Morse found no evidence suggesting that Plaintiff would not respond appropriately to supervisors or coworkers, or to changes in the work setting.  *Id.* at 488. And while Dr. Morse opined that some evidence existed that Plaintiff's mental health symptoms interfere with her functioning to some degree as she has some difficulty maintaining concentration and communicating clearly with others, her symptoms were helped with medication and counseling. *Id.* at 489.  He also explained that Plaintiff's work history showed that when Plaintiff was under

-15-

stress, she would avoid work altogether, but there was evidence to suggest that Plaintiff would have some minor difficulty handling normal, everyday work pressures.  *Id.*

Upon review of Dr. Morse's opinion, the evidence presented and the ALJ's decision, the Court finds that the ALJ appropriately addressed and weighed Dr. Morse's opinion and adequately accommodated Plaintiff's RFC in conjunction with this opinion as the ALJ limited Plaintiff to simple, routine, repetitive tasks with no tasks involving concentration on detailed tasks, in work with no fast-paced production requirements, with few workplace changes, and only simple work-related decisions.  *Id.* at 24-25.

## 2.  DR. WYNKOOP'S OPINION

Plaintiff also asserts that the ALJ failed to include in his decision two critical parts of Dr. Wynkoop's opinion.  The first is Dr. Wynkoop's statement  that "the test data support the unfortunate conclusion that Mrs. Shipley is one of a small percentage of patients with continued neurocognitive symptoms beyond the expected recovery time."  ECF Dkt. #15 at 14, citing Tr. at 557.  The second is Dr. Wynkoop's conclusion that "I am not optimistic about her odds of successfully returning to work in the near term from a neurocognitive, behavioral, and/or emotional perspective."  ECF Dkt. *Id.* at 559.

Plaintiff is correct that the ALJ did not mention these statements in his decision.  However, this failure does not lead to a conclusion that Plaintiff is disabled or a finding that the ALJ erred in not setting forth these statements in his determination.  The ALJ reviewed Dr. Wynkoop's clinical and objective findings.  Tr. at 28-29.  He noted that Dr. Wynkoop observed that Plaintiff had difficulties with her speech at the evaluation, including stuttering, mixing up words, finding the right words, mumbling and slurring her words.  *Id.* at 28-29.  The ALJ also acknowledged that Dr. Wynkoop observed other findings consistent with Plaintiff's brain injury.  *Id.*  However, the ALJ further noted that Dr. Wynkoop found that Plaintiff's conversational speech was fluent despite the word-finding problems and she could follow simple commands, repeat words and phrases, pronounce phonetically complex words, read, write and spell functionally.  *Id.* at 29.  The ALJ also noted that intelligence testing with Dr. Wynkoop indicated that Plaintiff's intellectual functioning was within the average range.  *Id.*

-16-

Moreover, while the ALJ did not quote the statements of which Plaintiff complains, the ALJ did cite to the statement made by Dr. Wynkoop subsequent to his comment about Plaintiff being in the small percentage of patients with symptoms beyond the expected recovery time.  The ALJ noted that Dr. Wynkoop subsequently indicated that "[t]o the positive, however, it has been only seven months since her accident injuries, and so we should expect continued improvements in cognition over time." Tr. at 29, citing Tr. at 557.  The ALJ considered this statement, as well as the positive findings by Dr. Wynkoop and other examining medical sources who made clinical findings, in addition to Plaintiff's presentation to him at the hearing.  *Id.* at 28-29.

Even considering these somewhat negative aspects of Dr. Wynkoop's opinion, the opinion was based upon a six-month period since Plaintiff's TBI as he issued his opinion in September of 2011 and Plaintiff sustained the mild TBI in March of 2011.  A six-month period does not suffice for meeting the disability requirements for social security purposes.  And Dr. Wynkoop's opinion does not confirm an expectation that Plaintiff would not recover within a twelve-month period.  He noted that most TBI experts expect the neuropsychological symptoms of mild TBI to clear typically within the first three months, if not earlier.  *Id.* at 557.  And while he surmised that Plaintiff was not within the majority of said patients since she still had symptoms, he did note that "it had only been seven months" since her injury and he expected continued improvements.  *Id.*  And while he indicated that he was not optimistic about Plaintiff's ability to successfully return to work, he did qualify that statement by indicating that he was not optimistic about this ability to return to work "in the near term." *Id.* at 559.  He also  attributed behavioral and emotional factors into this conclusion in addition to neuropsychological symptoms.  *Id.*  In addition, he explained that the "decision as to whether Ms. Shipley can return to work needs to rest solely with her physicians." *Id.*  He noted Plaintiff's memory concentration problems and ability to follow complex commands.  *Id.*  The ALJ accommodated Dr. Wynkoop's concerns by including in his RFC for Plaintiff limitations to simple, routine, repetitive tasks that do not involve concentration on detailed, precision or multiple simultaneous tasks, without fast-paced production requirement.  *Id.* at 24-25.

-17-

For these reasons, the Court finds that the ALJ properly addressed Dr. Wynkoop's opinion and substantial evidence supports his treatment of Dr. Wynkoop's opinion and the RFC determination.

### 3.    DR. BARNES' OPINION

As to Dr. Barnes' opinion, Plaintiff complains that the ALJ did not adequately consider her testing results, particularly the results of the WMS-IV test which measure memory and which revealed that Plaintiff scored in three standard deviations below the mean in delayed memory.  ECF Dkt. #15 at 14-16, citing Tr. at 668.  Dr. Barnes noted that the delayed memory score was significantly low relative to Plaintiff's average intellectual functioning range.  *Id.*  Dr. Barnes also noted that Plaintiff's STROOP test results showed difficulty coping with cognitive stress and processing complex input and her ability to accurately understand and comprehend information was influenced by cognitive flexibility, resistence to interference from outside stimuli, creativity and her current level of psychotherapy.  *Id.* at 669.  The Comprehensive Trail-Making Test also showed one standard deviation below the mean in attention, concentration and resistance to distraction.  *Id.* at 672. Both the STROOP and the Trail test also confirmed difficulties with focusing.  *Id.*   Another test result showed that Plaintiff had difficulty filtering out external stimuli which affected her overall concentration.  *Id.* at 672.  Plaintiff asserts that the ALJ ignored these significant test results which showed that she did not have the concentration and attention to attend to any tasks for even 80% of the workday.  ECF Dkt. #15 at 17.

In addressing Dr. Barnes' opinion concerning the objective test results showing severe memory impairment and problems concentrating and focusing, the ALJ declined to afford the opinion significant weight.  Tr. at 30.  The ALJ explained that he attributed less than significant weight to the opinion because a third-party witness report in the file indicated that a phone rang numerous times during the testing and examination and a vacuum cleaner was running on and off as well.  *Id.*   The third-party witness was an individual who accompanied Plaintiff to the examination and sat with her.  *Id.* at 334-338.  The ALJ noted that in spite of these distractions in a less than ideal testing situation, the test results showed that Plaintiff performed well as she was able to complete serial seven subtraction tests and abstract basic information tests.  *Id.* at 29.

The ALJ also reasoned that "the scores Dr. Barnes obtained were assessed a year after Dr. Wynkoop's examination, and were relatively within the same ranges, suggesting that her condition did not deteriorate as significantly as the claimant alleged." *Id.* The ALJ thereafter concluded that the objective evidence failed to establish that Plaintiff's cognitive and mental impairments would bar all competitive employment. *Id.* He indicated that Dr. Barnes' conclusions, as well as those parts of Drs. Morse and Wynkoop's opinion which presented indications of limited cognitive abilities, were not consistent with the mental status examinations and objective testing. *Id.* at 34.

The Court finds that the ALJ has not presented a sufficiently sound basis for his decision to afford less than significant weight to the opinion and findings of Dr. Barnes. First, the Court notes that Dr. Barnes reported that Plaintiff did calculate a serial sevens subtraction task, but she did so slowly and did so correctly only after she corrected two errors that she had made. Tr. at 665. Further, Dr. Barnes noted that while Plaintiff was able to recall six digits forward and five digits backward, and she could follow a three-step command, she observed that Plaintiff had problems with her memory and test results on the memory test showed three standard deviations below the mean. *Id.* at 668. Another test result showed severe impairment with tasks that were highly vulnerable to the effects of brain injury. *Id.* at 669. Dr. Barnes further noted that Plaintiff's numerous prescription medications also affected her ability to stay alert and focused. *Id.* at 668. The third-party report of a phone ringing and vacuum cleaner noise fail to provide adequate support for the ALJ's decision to attribute less weight to Dr. Barnes' conclusions when Dr. Barnes concluded based upon observation and test results that Plaintiff's level of cognitive function was compromised due to problems with attention, focusing, and short-term memory. *Id.* at 30.

The ALJ also reasoned that because Dr. Barnes' test results were relatively within the same range as those of Dr. Wynkoop who had assessed Plaintiff nearly a year earlier, Plaintiff's condition had not worsened as significantly as Plaintiff had alleged. Tr. at 30. Such a statement is not within the expertise of the ALJ and is not a sound and supported reason for attributing less than significant weight to the opinions and test results by Dr. Barnes.

The ALJ additionally noted that Plaintiff's demeanor and manner at the hearing before him was a factor in determining his decision as to the weight to give the medical sources' reports and

-19-

opinions.  Tr. at 32.  He indicated that Plaintiff answered questions logically and was able to stay on point and remembered specific details during the hearing, which was under one hour in length. *Id.*  As he acknowledged, however, Plaintiff's cognitive abilities during the hearing were not a conclusive indicator of her ability, although he properly considered her demeanor as a factor.  *Id.*

In sum, while an ALJ is not required to give good reasons for the weight given to an examining source's opinion, when he does provide reasons in his decision, those reasons should be sound and supported.  The ALJ's reasons in this case are not adequately supported for the treatment of Dr. Barnes' opinion and the accompanying test results.

Accordingly, the Court finds that this case should be remanded for the ALJ to reevaluate Dr. Barnes' report and opinion and to provide sound and supported reasons for his decision to attribute less than significant weight to the opinion, should he again choose to do so.

### B.       PLAINTIFF'S OTHER ASSERTIONS OF ERROR

Since the Court remands the instant case for reevaluation of Dr. Barnes' report and test results, the Court declines to address Plaintiff's additional assertion concerning the ALJ's RFC for her and her assertion that the ALJ erred in his evaluation of the reviewing psychologist's opinion.

### VII.   CONCLUSION

For the foregoing reasons, the Court REVERSES the ALJ's decision and REMANDS the instant case for reevaluation and more thorough explanation of the treatment of Dr. Barnes' opinion and test results.


DATE: August 8, 2016                              */s/George J. Limbert*

                                                   GEORGE J. LIMBERT
                                                   UNITED STATES MAGISTRATE JUDGE

-20-